**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2016-NMCA-021

Filing Date: December 14, 2015

Docket No. 33,896

STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,

       Petitioner-Appellee,

v.

ALFONSO M.-E.,

       Respondent-Appellant,

and

IN THE MATTER OF URIAH F.-M.,

       Child.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
William E. Parnall, District Judge

Children, Youth & Families Department
Charles E. Neelley, Chief Children's Court Attorney
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Peter G. Tasso Law Firm, P.C.
Peter G. Tasso

1

Albuquerque, NM

Guardian Ad Litem

**OPINION**

**WECHSLER, Judge.**

**{1}** Father, Alfonso M.-E., appeals from the district court's judgment terminating his parental rights to Child, Uriah F.-M., under two statutory provisions of the Abuse and Neglect Act (ANA), NMSA 1978, §§ 32A-4-1 to -34 (1993, as amended through 2015). The court also terminated the rights of Child's mother, Brandi S. (Mother), but she has not appealed. Father challenges the district court's termination pursuant to Section 32A-4-28(B)(1) and argues that clear and convincing evidence did not support the district court's finding that he abandoned Child. Father also raises sufficiency of evidence claims in appealing the district court's termination on the basis of Section 32A-4-28(B)(2). In this regard, Father contends that the district court erred in finding that (1) he neglected Child; (2) the causes and conditions of neglect were unlikely to change in the foreseeable future; and (3) the Children, Youth and Families Department (CYFD) made reasonable efforts to assist Father in adjusting the conditions that rendered him unable to properly care for Child. Father also contends that CYFD violated his due process rights by failing to provide him adequate translation services and, finally, argues that he was denied effective assistance of counsel.

**{2}** We hold that our Supreme Court's opinion in *In re Grace H.*, 2014-NMSC-034, 335 P.3d 746 renders the district court's termination of Father's parental rights for abandonment under Section 32A-4-28(B)(1) improper. We also hold that the record is not sufficient to support, by clear and convincing evidence, that the causes and conditions of neglect were unlikely to change in the foreseeable future or that CYFD made reasonable efforts to assist Father in adjusting the conditions that rendered him unable to properly care for Child under Section 32A-4-28(B)(2). Because we reverse the district court's termination of Father's parental rights on these grounds, we do not reach Father's due process and ineffective assistance of counsel arguments.

**BACKGROUND**

**{3}** Child was born on August 20, 2012 to Father and Mother. On January 24, 2013, CYFD took Child into custody after receiving an emergency referral alleging physical neglect and a lack of adequate supervision of Child by Mother, who reportedly had been arrested on outstanding warrants. CYFD also took Child's half-brother, Isaac K., born April 11, 2005, into custody and placed the two with the same foster family. Father is not the biological father of Child's half-brother.

**{4}** On January 28, 2013, CYFD filed a neglect and abuse petition against Father and Mother, alleging that Child was without proper parenting or parental supervision due to Mother's substance abuse issues, her inability to provide safe and stable housing, and her

2

criminal lifestyle. As to Father, the petition alleged that he abandoned Child and had "failed to protect [Child] from [M]other's drug abuse, homelessness, criminal conduct and neglect." The petition further alleged that Father's location was unknown. It was determined at the initial custody hearing on February 6, 2013 that Father was incarcerated and was subject to an immigration hold. Father had been incarcerated since December 2012 due to his arrest for driving while under the influence of intoxicating liquor or drugs.

{5} At the adjudicatory and dispositional hearing held on March 8, 2013, Father appeared with the aid of an interpreter and entered a plea of no contest to the allegations in CYFD's petition, acknowledging that Child was a "neglected" child pursuant to Section 32A-4-2(E)(2), and that Father had "failed to provide for [Child's] basic necessities." The district court entered a stipulated judgment and disposition against Father on March 28, 2013. The treatment plan developed by CYFD for Father and adopted by the court indicated that Father had "expressed a strong desire to maintain his bond with [Child]." The plan specified that Father was required to complete substance abuse, mental health, psychosocial, and domestic violence assessments and follow all recommendations made by those assessments. The plan also mandated that Father "will provide random [urinalyses] as determined by [CYFD]." Further, the treatment plan included the requirements that Father maintain weekly contact with CYFD, obtain safe and stable housing, create a financial plan to ensure Child's basic needs are met, engage in parenting education, participate in family time at CYFD's discretion, and provide letters, photos, and other memorabilia for Child's life book. For CYFD's part, the treatment plan required CYFD to "make appropriate recommendations[,] . . . make referrals[,] and monitor [Father's] progress."

{6} Father spoke through an interpreter at the initial judicial review hearing on May 17, 2013 to inform the court that he was currently incarcerated and serving his sentence for his DWI conviction and that he might face immigration detention and deportation to Mexico following completion of his sentence. CYFD's judicial review report, which the court adopted by reference, indicated that Father had "done as much as possible considering his current incarceration and [immigration] hold" but that Father was "also waiting to be deported, and may not be able to be a consistent caretaker for [Child]." The report also noted that Father had "engaged in [an addiction treatment program], but hasn't been able to do any further substance abuse programs due to his current incarceration and [immigration] hold." The report additionally stated that Father "has written letters to [his permanency planning worker (PPW)] regarding [Child] and his [incarceration] status" and provided CYFD the names of Father's relatives for Child's possible placement. The court ordered CYFD to implement its permanency plan of reunification.

{7} In August 2013, Father was transferred from New Mexico to a federal holding facility in El Paso, Texas for immigration processing. He was subsequently deported to Mexico in September 2013. Father called his PPW, Frances Steckbauer, and left her a voicemail after he arrived in Mexico. During this time, CYFD requested the Mexican Consulate's assistance in conducting a psychological evaluation of Father and a study of Father's sister's home in Mexico where Father was living. Additionally, with the help of the

3

Consulate, Steckbauer coordinated a telephone call with Father in October 2013 and told Father to maintain monthly communication with CYFD.

**{8}**     Shortly thereafter, on October 28, 2013, CYFD moved to terminate Father's parental rights to Child. CYFD asserted that Father, "[w]ithout justifiable cause, . . . ha[d] not communicated with or provided support for [Child] in over 3 months" and "ha[d] abandoned [Child]." Moreover, CYFD argued, Father was "in substantial non-compliance with his treatment plan[.]" Among Father's failures, CYFD stated that Father had not completed the required assessments, provided proof to CYFD that he had obtained safe and stable housing, provided random urinalyses, maintained weekly contact with CYFD, or discussed his history with CYFD. CYFD also asserted that Father had not provided it with names of relatives for possible placement with Child, participated in family time with Child, provided Child with memorabilia for his life book, or created a financial plan to ensure Child's needs would be met.

**{9}**     The following week, on November 4, 2013, the court held the initial permanency planning hearing. Father was not present at the hearing but was represented by his attorney who notified the court that Father had been deported. CYFD informed the court that CYFD had stayed in contact with the Consulate, which provided CYFD an address and the phone number for Father in Mexico as well as the names of some of Father's relatives living in Mexico. However, CYFD further represented that Father had made no attempts "to contact [CYFD] at all [after his deportation], even though Ms. Steckbauer made sure [Father] had all of [CYFD's] contact information." Although the court approved changing CYFD's plan from reunification to adoption, the court explicitly asked CYFD to "continue trying to open a line of communication with [Father] to determine what, if anything, he wants to do to work his plan."

**{10}**     In accordance with CYFD's request through the Consulate, Mexican officials conducted a study of Father's sister's home on November 5, 2013. Father, who was employed as a day laborer, provided his financial information as part of the study. A November 6, 2013 urinalysis administered in Mexico indicated that Father tested negative for amphetamines, cocaine, and marijuana. By December 2013, Father had also completed a psychological evaluation that recommended he engage in therapy sessions. In a letter to the Mexican Consulate dated December 16, 2013, a government official from Mexico's social service agency in Father's municipality explained that Father would be offered six sessions of therapy in accordance with the psychological evaluation recommendation and that the first session was scheduled for December 18, 2013. The official additionally referenced the Consulate's request for Father to attend parenting classes but indicated that Father's municipality did "not have an institution capable of offering them," and therefore proposed that "[parenting] classes be substituted by psychological therapy where facts based on paternity will be taken into consideration."

**{11}**     Father's termination of parental rights trial began on January 10, 2014. Father appeared telephonically and was assisted by an interpreter. In its opening argument, CYFD

4

argued that Father had failed to comply with his treatment plan by not completing "even the minimal things he could have done while he was incarcerated" in New Mexico and that Father had "only done the minimal that he can since he left the United States." CYFD pointed out that Father had not completed a mental health assessment "until just recently" and that he had not completed substance abuse assessment "until very recently." CYFD also argued that Father "may have done one [urinalysis] through the Mexican Consulate" and "only recently acquired safe and stable housing." CYFD also cited Father's failure to maintain weekly contact with CYFD, provide support for Child, give any gifts to Child, and communicate with Child as reasons supporting termination. CYFD also told the court that Child has no bond with Father and has not heard Father's voice or seen Father since the inception of the case.

{12}     Steckbauer testified that she developed Father's treatment plan based on the circumstances of his incarceration as well as his disclosures about his DWI and substance abuse history. Steckbauer explained that she visited Father monthly during his incarceration in New Mexico until August 2013 and that CYFD had mailed Father a copy of his treatment plan after he was deported. She testified that since Father's deportation, she had two telephone calls with Father that were facilitated by the Mexican Consulate to assess Father's situation. Steckbauer stated that Father completed the home study and psychological evaluation that CYFD requested through the Consulate "but [Father] hasn't completed any follow-up services." She also stated that Father submitted a urinalysis but had "not specifically completed a substance abuse assessment" and that she had not received proof of Father's completion of an addiction treatment program he engaged in during his incarceration in the United States. Further, Steckbauer said that Father had not completed parenting education and that he informed her during their last telephone call in December 2013 that he was "still waiting to find out when he was going to start parenting classes and therapy." Although Father had provided his financial information as part of the home study in Mexico, Steckbauer stated that he had not sent Child any financial support. Father was living with his mother and sister in Mexico, Steckbauer additionally testified, but he had not provided CYFD their names as potential placements for Child while Father was incarcerated in the United States. In summary, she stated that "apart from no longer being in custody" Father had made no progress in eliminating causes and conditions of Child's neglect.

{13}     In Steckbauer's opinion, CYFD would have no justification to split up Child's current placement with his foster family, where Child had lived with his half-brother since the inception of the case. She stated that Child was very young when he entered the home, that "this is the home that [Child] knows[,]" and that "he's very comfortable." Steckbauer also testified that Child also had specific needs related to his speech development and was receiving early intervention services. During her few phone calls with Father, Steckbauer "worked to keep him informed of [Child's] well-being," but she stated that Father has not had any "hands-on experience" in addressing Child's needs. Steckbauer testified that Father told her that he cares for Child but that Father stated that he has not had much contact with Child because of Father's incarceration. She said that Father had not participated in family time with Child or had any communication with Child since CYFD took Child into custody.

Steckbauer stated that Father wrote to Child during Father's incarceration but that he had not sent any letters to Child since Father was deported. Steckbauer further testified that she had explored the possibility of Father's relatives in the United States serving as possible placements for Child, but they were either non-responsive to her requests or their legal status precluded their eligibility. According to Steckbauer, it would not be safe to return Child to Father because there had been no "direct communication" between Father and Child and that "it would be harmful to [Child] to place him suddenly with someone who he has no relationship with."

**{14}** During cross-examination, Steckbauer testified that the Consulate had sent her an email with Father's home study and urinalysis results, but she admitted that she had not seen Father's psychological evaluation. She did not recall the date of the evaluation and did not have a copy of the evaluation in her file. Steckbauer also testified that she had not seen the December 18, 2013 letter regarding Father's therapy sessions. She stated that the evaluation and letter may be included in a packet of documents that she recently received from the Consulate, but she had not yet reviewed the documents. Nevertheless, Steckbauer testified, she knew the outcome of the evaluation because in December 2013 she had "a thorough conversation" with Father and the Consulate's protective services staff about the results. However, she indicated that her discussion with the Consulate's staff did not cover the December 18, 2013 letter. Father's counsel attempted to introduce Father's psychological evaluation and the December 16, 2013 letter regarding Father's therapy sessions, but because the documents had not been translated from Spanish into English, CYFD stipulated to a continuance of the trial.

**{15}** Before trial resumed in February 2014, CYFD filed an amendment to its motion for termination, incorporating the grounds alleged in its original motion and asserting the additional ground that Father had abandoned Child. The court also held a subsequent permanency hearing on January 27, 2014. Father appeared telephonically and was assisted by an interpreter. CYFD informed the court that its amendment to its motion for termination was based on information CYFD received at the trial, specifically that Father had not contacted Child or provided support for Child. CYFD also argued that the psychological evaluation Father received in Mexico recommended that he receive various types of counseling but that Father had done nothing to obtain the services. In its permanency hearing order, the court found that Father "made some efforts to comply with and cooperate in the treatment plan" but that Father had not made progress toward alleviating the causes that precipitated CYFD's need to take custody of Child. The court adopted CYFD's latest treatment plan and also granted CYFD's amendment to its termination motion.

**{16}** Steckbauer's testimony resumed on the second and final day of the termination trial, February 13, 2014. Her testimony revealed that her final conversation with Father occurred in early December 2013, prior to her receipt of Father's psychological evaluation and before Father began his therapy sessions. She testified that she talked with Father about scheduling the therapy sessions recommended by the psychological evaluation and that she asked Father to address parenting issues and his substance abuse history during the sessions. Steckbauer

6

also informed Father that she had received the home study, but she did not discuss the results of the study with Father or notify him of any additional information that CYFD needed. At that time, Father inquired about Child, expressed that he wanted Child with him in Mexico, and asked Steckbauer for a picture of Child, which Steckbauer stated she did not send to Father.

**{17}**     Father's counsel introduced a January 30, 2014 letter from the Mexican psychologist who had conducted Father's psychological evaluation. The letter, which Steckbauer said she had received from the Consulate, stated that Father "completed the psychological therapy [*sessions*] on January 23, of this year, showing favorable control of emotions[.] Likewise, regarding the topic of [parenting] covered in therapy [*sessions*], [Father] is capable of being in charge of [Child]." Given that parenting classes were not available in Father's village in Mexico, Steckbauer testified that she believed that Father complied with the alternative recommendation to address parenting issues in his therapy sessions and that Father "addressed parenting to the best of his ability" in accordance with his treatment plan. Nevertheless, Steckbauer testified that she did not agree with the psychologist's conclusion about Father's parenting capability. For example, she stated that the letter did not alleviate her concerns about Father's "impulsivity" issues that were identified as part of the psychologist's initial diagnosis. However, Steckbauer testified that she never asked Father to address impulsivity issues in his therapy sessions and that she had not communicated with Father since their December 2013 conversation. Steckbauer stated that she was unable to set up an appointment to speak with Father in January 2014 "because of [her] caseload."

**{18}**     During redirect examination, CYFD elicited testimony from Steckbauer that was critical of the home study and psychological evaluation requested through the Consulate. With regard to the home study, Steckbauer testified that the study did nothing to explore Father's possible criminal history or whether there had been abuse or neglect allegations against Father in Mexico. She also said that she had no knowledge of how long it took Mexican investigators to complete the home study, whether investigators had interviewed members of Father's family outside of the home, or whether investigators had explored "medical issues" of anyone in Father's family. Turning to Father's psychological evaluation, Steckbauer said that she had never seen a psychological evaluation "as short as [Father's]." She testified that out of the "innumerable" psychological evaluations she had reviewed as a social worker, none of them had lacked "diagnosis one through four diagnoses" or a "global assessment of functioning." Father's evaluation failed to include these assessments and, in her experience as a social worker, she had never seen someone pass domestic violence, parenting education, and substance abuse areas with six sessions of therapy. She also testified that the urinalysis provided by Father did not satisfy her need to know whether Father was using illegal substances or alcohol.

**{19}**     At the conclusion of testimony, the court terminated Father's parental rights to Child. In its judgment, the court found that there was clear and convincing evidence that (1) Father abandoned Child, (2) Father had not alleviated the conditions and causes of neglect, (3) the conditions and causes of neglect were unlikely to change in the foreseeable future, and (4)

CYFD made reasonable efforts to assist Father in adjusting those conditions. The court further found that termination "would promote the physical, mental, and emotional welfare and needs of [Child]." This appeal followed.

## TERMINATION FOR ABANDONMENT UNDER SECTION 32A-4-28(B)(1)

{20}    As an initial matter, we address the district court's termination of Father's parental rights on grounds of abandonment under Section 32A-4-28(B)(1). Father advances a sufficiency of evidence claim to attack the district court's judgment regarding his abandonment of Child. However, our Supreme Court's opinion in *In re Grace H.* is controlling legal authority that dictates our analysis of this issue on appeal.

{21}    The ANA's definition of "abandonment" encompasses "instances when the parent, without justifiable cause . . . left the child with others, including the other parent or an agency, without provision for support and without communication for a period of . . . three months if the child was under six years of age." Section 32A-4-2(A)(2)(a). Section 32A-4-28(B)(1) imposes the mandatory requirement that a court terminate parental rights if "there has been an abandonment of the child by his parents[.]" CYFD relied heavily on Father's failure to send gifts, support, or letters to Child, except for one letter in April 2013, as evidence in support of termination on grounds of abandonment. *See In re Adoption of Doe*, 1976-NMCA-084, ¶ 73, 89 N.M. 606, 555 P.2d 906 ("The typical kinds of conduct which constitute abandonment are the withholding of parental presence, love, care, filial affection and support and maintenance." (internal quotation marks and citation omitted)). In its findings of fact supporting termination, the district court specified that Father "has had no contact and provided no support for [Child] for a period of at least three months prior to the commencement of the trial in this case . . . [Father] did not provide any justification for failing to contact or provide support for [Child]."

{22}    In *In re Grace H.*, our Supreme Court curtailed the statutory requirement that a court "shall terminate parental rights" under Section 32A-4-28(B)(1) if a child has been abandoned. The intent of the Legislature, our Supreme Court explained, is that Section 32A-4-28(B)(1) is "to be used when there is no parent present with whom [CYFD] could work towards reunification prior to termination." *In re Grace H.*, 2014-NMSC-034, ¶ 41. The Court therefore held that Section 32A-4-28(B)(1) applies "where a parent is absent prior to termination." *In re Grace H.*, 2014-NMSC-034, ¶ 43. Conversely, the Court held that Section 32A-4-28(B)(2) "is to be used where a parent is present and expresses a legitimate desire to take responsibility for a child prior to termination." *In re Grace H.*, 2014-NMSC-034, ¶ 43. Section 32A-4-28(B)(2) imposes a separate statutory trigger for the termination of parental rights when abandonment of a child has occurred. *See State ex rel. Children, Youth & Families Dep't v. Christopher B.*, 2014-NMCA-016, ¶ 9, 316 P.3d 918 ("Abuse or neglect and abandonment are separate and independent grounds for the termination of parental rights, and they have a distinct set of statutorily created requirements."). That section requires termination of parental rights when a "court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite

8

reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A-4-28(B)(2); *see* § 32A-4-2(E)(1) (defining a "neglected child" as a child "who has been abandoned by the child's parent, guardian or custodian").

**{23}**   In this case, the motions CYFD filed with the district court and the district court's judgment failed to identify which statutory mechanism was used to terminate Father's parental rights on the basis of abandonment. Our review of the record nonetheless reveals that CYFD proceeded under a theory of abandonment pursuant to Section 32A-4-28(B)(1) in moving to terminate Father's parental rights. In its closing argument, CYFD specifically stated that "the abandonment statute is mandatory" and requires the court to terminate parental rights if a parent has abandoned his or her child. Moreover, at the conclusion of trial, the district court found that Child was abandoned as defined under Section 32A-4-2(A)(2)(a) and ultimately determined that Section 32A-4-28 required the court to terminate Father's parental rights. Therefore, in view of *In re Grace H.*, the district court's use of Section 32A-4-28(B)(1) to terminate Father's parental rights on the basis of abandonment was improper. The record clearly supports that Father was present prior to the district court's termination and that Father expressed a legitimate desire to take responsibility for Child. *See State ex rel. Children, Youth & Families Dep't v. Melvin C.*, 2015-NMCA-067, ¶ 23, 350 P.3d 1251 (interpreting *In re Grace H.*'s use of "legitimate desire" as "referenc[ing] a parent who is present and willing to participate, even if they do so late in the game, so long as they do so prior to termination" (internal quotation marks and citation omitted)).

**{24}**   It is important to note that the district court did not terminate Father's rights based on presumptive abandonment. Accordingly, our holding does not reach the question of whether presumptive abandonment was an appropriate basis for termination under the specific circumstances of this case. *See, e.g.*, Section 32A-4-28(B)(3) (providing that a court shall terminate parental rights if certain conditions exist that create a presumption of abandonment that has not been rebutted); *see also In re Grace H.*, 2014-NMSC-034, ¶¶ 36, 38 (stating that presumptive abandonment is distinct from abandonment under Section 32A-4-28(B)(1) and Section 32A-4-28(B)(2) and that presumptive abandonment was not applicable to the analysis of the case).

**EVIDENCE SUPPORTING THAT THE CAUSES AND CONDITIONS OF NEGLECT WERE UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE UNDER SECTION 32A-4-28(B)(2)**

**{25}**   Father also challenges the sufficiency of the evidence underlying the district court's judgment terminating his parental rights to Child under Section 32A-4-28(B)(2), specifically arguing that clear and convincing evidence did not exist to prove that (1) Father neglected Child, (2) the causes and conditions of neglect were unlikely to change in the foreseeable future, and (3) CYFD made reasonable efforts to assist Father in adjusting the conditions that rendered him unable to properly care for Child.

9

**{26}** "Terminating parental rights implicates rights of fundamental importance." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072. Accordingly, clear and convincing evidence is the standard of proof for termination of parental rights cases. Section 32A-4-29(I); *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778. To meet the clear and convincing evidence standard, the evidence "must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Adoption of Doe*, 1982-NMCA-094, ¶ 31, 98 N.M. 340, 648 P.2d 798 (internal quotation marks and citation omitted). In order to analyze Father's claims of evidentiary sufficiency, we must determine whether the district court's decision is supported by substantial evidence of a clear and convincing nature. *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 22, 132 N.M. 299, 47 P.3d 859. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *State v. Laguna*, 1999-NMCA-152, ¶ 7, 128 N.M. 345, 992 P.2d 896. On appeal, this Court will "not reweigh the evidence or substitute our judgment for that of the trial court on factual matters or on matters of credibility." *State ex rel. Children, Youth & Families Dep't v. William M.*, 2007-NMCA-055, ¶ 59, 141 N.M. 765, 161 P.3d 262. "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly determine that the clear and convincing standard was met." *Hector C.*, 2008-NMCA-079, ¶ 11 (internal quotation marks and citation omitted).

**{27}** The ANA requires that CYFD carry the clear and convincing evidentiary burden of proof in termination of parental rights cases. Under Section 32A-4-28(B)(2), CYFD must establish that a child has been neglected or abused as contemplated by the ANA. Moreover, CYFD must show "that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A-4-28(B)(2). CYFD must also demonstrate that termination serves "the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." Section 32A-4-28(A); *see Patricia H.*, 2002-NMCA-061, ¶ 21.

### A.  Finding of Neglect

**{28}** Father first contends that there was not clear and convincing evidence to support the district court's finding that he neglected Child because Father's plea and the court's adjudication under Section 32A-4-2(E)(2) were based solely on his incarceration status. Father argues that his subsequent release from incarceration in the United States ameliorated the basis for neglect. We disagree.

**{29}** Our standard of review for the district court's adjudication of neglect "is a narrow one." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066. Father suggests that evidence that arose after the district court's

adjudication of neglect should nullify the court's finding, but our review is restricted "to a determination of whether the district court could have found [neglect] based upon the evidence before it." *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 7, 137 N.M. 687, 114 P.3d 367. We therefore reject Father's argument that his release from jail after the district court's adjudication of neglect is a dispositive legal ground on which we may reverse the court's finding.

**{30}** The district court adjudicated Child as neglected by Father pursuant to Section 32A-4-2(E)(2). That section provides that a "neglected child" is a child "who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . when able to do so, to provide them[.]" *Id.* Father pleaded no contest to the neglect allegations, and the district court accepted Father's plea after inquiring as to the factual basis for Father's admission. *See* Rule 10-342(D) NMRA ("The court shall not enter judgment upon an admission, including the entry of a no contest plea . . . without making such inquiry as shall satisfy the court that there is a factual basis for the admission[.]"). The court found that Father had "failed to provide for [Child's] basic necessities[,]" and the court adopted CYFD's position that Father was "unable to care for [Child] in a safe and stable environment due to his incarceration."

**{31}** It is true that Father's incarceration status alone is not sufficient for the district court to find that Father neglected Child. *See Shawna C.*, 2005-NMCA-066, ¶ 30 (concluding that the ANA "does not permit a court to find abuse or neglect based solely on a parent's [incarceration] status"). However, despite Father's incarceration at the time of the district court's adjudication, he nevertheless had a continuing legal obligation to provide proper care for Child. "When a parent is incarcerated and unable to fulfill ordinary parental duties, the court should consider whether the parent has pursued other opportunities and avenues that could be available in order to carry out such duties to the best of his or her ability." *Hector C.*, 2008-NMCA-079, ¶ 23. Although the record of the proceedings below indicates that Father's inability to care for Child arose from his incarceration, Father did not provide financial support for Child or make other arrangements for Child's care or placement while Father was incarcerated in the United States. Based on this evidence, substantial evidence supported the district court's finding that Father neglected Child.

### B.     Causes and Conditions of Neglect

**{32}** Father next argues that clear and convincing evidence did not support the district court's finding that the causes and conditions of Child's neglect were unlikely to change in the foreseeable future. Father argues that (1) he promptly cooperated with his treatment plan requirements after his deportation, (2) the court improperly relied on evidence of his past history to support the termination of his parental rights, (3) CYFD's assertions regarding his mental health diagnosis were speculative and failed to comport with the court's original finding of neglect, and (4) the district court's reliance on CYFD's alleged deficiencies of the home study was likewise improper.

**{33}**     In reviewing Father's sufficiency claim, we are mindful that a treatment plan under the ANA "identifies, addresses, and attempts to correct those circumstances and conditions which rendered the child abused or neglected." *State ex rel. Children, Youth & Families Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 38, 130 N.M. 781, 32 P.3d 790. At trial, Steckbauer testified that she based her development of Father's treatment plan on his disclosures about "his DWI history [and] substance abuse history" and the "restrictions of [Father's] criminal situation[.]" Related to these causes and conditions, the evidence must be substantial to meet the statutory condition that Father was unlikely to alleviate them in the foreseeable future. *Patricia H.*, 2002-NMCA-061, ¶ 22. We have construed "foreseeable future" to "refer to corrective change within a reasonably definite time or within the near future." *Id.* ¶ 34 (internal quotation marks and citation omitted).

**{34}**     CYFD initiated termination proceedings approximately one month after Father was deported. At that time, Child had been in CYFD's custody for nine months. Steckbauer testified that she never received proof of Father's completion of the addiction treatment program during his incarceration in the United States, but the evidence presented to the district court at trial focused primarily on Father's compliance with his treatment plan following his deportation. After Father's deportation, CYFD requested the assistance of the Mexican Consulate in conducting a psychological evaluation and home study for Father. The evidence clearly established that Father voluntarily and timely participated in a psychological evaluation arranged by the Consulate and completed six sessions of individual therapy that were recommended by the evaluation. Father also obtained employment, participated in a study of the home where he lived with his mother and sister, disclosed his financial information as part of that study, and submitted to a urinalysis that screened for illegal drugs.

**1.     Evidence Supporting Father's Alcohol and Substance Use**

**{35}**     The district court did not enter a finding that CYFD presented evidence that Father's alcohol and substance abuse persisted as a continuing cause and condition of neglect. Father therefore challenges the district court's termination decision by arguing that the district court erred in relying on stale and speculative evidence that was based on generalizations of Father's past conduct. In response, CYFD points to the evidence of Father's previous DWI conviction, which CYFD argues resulted from Father's "history of substance abuse" and cites Father's submission of "only one drug screen" that did not test for alcohol.

**{36}**     With respect to the drug screen, Steckbauer testified that the urinalysis submitted by Father on November 6, 2013 did not satisfy her need to know whether Father was using alcohol or other substances. The court found that Father "only provided one [urinalysis] during the life of the case, but did not provide a series of tests to determine whether alcohol and substance abuse issues were being addressed or alleviated. The [urinalysis] provided did not test for alcohol, one of [Father's] issues." However, there is no evidence that CYFD notified the Consulate or Father that the initial urinalysis was deficient because it failed to test for alcohol. There is likewise no evidence that CYFD made any requests through the

12

Consulate or to Father for additional urinalyses that would have established whether Father had failed to alleviate his alcohol problem, despite the treatment plan's requirement that Father "will provide random [urinalyses] *as determined by [CYFD]*." (Emphasis added). CYFD also failed to present any evidence suggesting that Father was directed by CYFD to submit urinalyses that screened for alcohol but was noncompliant or unwilling to do so. Steckbauer's final conversation with Father occurred in early December 2013, and Father testified that Steckbauer did not discuss the subject of drug tests with him at all.

**{37}** In the absence of evidence showing any efforts on the part of CYFD to obtain additional urinalyses, we do not believe that Father's submission of one inconclusive drug screen constituted evidence that he had failed to alleviate the causes and conditions of neglect or was unlikely to do so in the foreseeable future. *Cf. State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 22, 141 N.M. 299, 154 P.3d 674 (holding that an initial positive toxicology test was inconclusive and therefore did not constitute clear and convincing evidence that established the child's neglect). The district court incorrectly applied the burden of proof that is required in a termination of parental rights case by holding the informational deficit regarding Father's alcohol and substance use against him. Notably, in announcing its findings at the conclusion of trial, the court stated that Father "ha[d] not presented evidence that supports the conclusion" that he had alleviated the causes and conditions of neglect. The court specified that there was evidence that Father "has an alcohol problem" but that there was no evidence regarding "whether he's still drinking." CYFD is not entitled to transfer its evidentiary burden under the ANA as a result of Father's deportation, particularly when Father made efforts to comply with a treatment plan that imposes responsibilities on CYFD to assess the continuing existence of the causes and conditions of neglect. Such a result would contravene the statutory duty of CYFD under the ANA and undermine the fundamental nature of parental rights. *See State ex rel. Children, Youth & Families Dep't v. Marsalee P.*, 2013-NMCA-062, ¶ 25, 302 P.3d 761 ("The district court has an affirmative obligation to make sure that the requirements of the [ANA] are followed prior to the termination of something as fundamental as the parental rights to a child."). The district court therefore erred by relying on the *lack* of evidence regarding Father's alcohol and substance abuse as if it were, in actuality, evidence supporting its finding that Father was unlikely to alleviate his alcohol and substance abuse problem in the foreseeable future. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012) ("A lack of evidence does not constitute clear and convincing evidence.").

**{38}** As additional evidence of the persistence of Father's "history of substance abuse" as a cause and condition of neglect, CYFD relies on Steckbauer's testimony that six therapy sessions were inadequate to address that history. CYFD also argues that Father was not engaged in substance abuse treatment or "relapse prevention" at the time that his parental rights were terminated. At trial, Steckbauer testified that she spoke with Father in early December 2013 about "having the therapy sessions set up" that were recommended by the psychological evaluation and that she discussed with Father "when [the sessions] would be beginning." She told Father that he should address "his substance abuse history" in his therapy sessions as part of his treatment plan requirements. The evidence showed that

13

Father's schedule of therapy sessions began on December 18, 2013 and that he completed the sessions on January 23, 2014.

**{39}** Although Father's treatment plan required CYFD to "make appropriate recommendations[,] . . . make appropriate referrals[,] and monitor [Father's] progress[,]" Steckbauer had no further contact with Father after their telephone conversation in early December 2013. Steckbauer requested documentation from the Consulate that described what issues were specifically being addressed in Father's therapy sessions, but she did not contact Father after she received the documents from the Consulate or after she received confirmation of Father's completion of the recommended therapy sessions. There is also no evidence that Steckbauer or anyone else from CYFD communicated with the Consulate after Father completed the sessions. Instead, CYFD elicited testimony from Steckbauer in which she stated generally that, based on her experience, she had never seen a person successfully deal with parenting, domestic violence, and substance abuse issues in six sessions of therapy. The court found that Father had participated in six individual therapy sessions recommended by the psychological evaluation but that the sessions "did not satisfy [CYFD's] requirement for . . . substance abuse[.]" The court also found that Father "did not participate in a . . . substance abuse assessment[,]" even though CYFD did not present evidence that it requested an assessment through the Consulate or otherwise referred Father for an assessment.

**{40}** We agree with Father that CYFD relied on vague references to Father's past to draw speculative inferences about the current and future existence of the causes and conditions of neglect. *See Baca v. Bueno Foods*, 1988-NMCA-112, ¶ 15, 108 N.M. 98, 766 P.2d 1332 ("Evidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition."). Other than Father's incarceration for DWI and Steckbauer's testimony that Father disclosed a history of substance abuse, we could not identify any explanations or details in the record regarding the extent or severity of Father's history of alcohol or substance abuse, such as past criminal convictions or the specific types of substances involved. The record also does not explain whether the basis for Father's DWI conviction was for the use of alcohol or drugs. CYFD's evidence in support of termination consisted solely of the testimony of Steckbauer, who instructed Father to address his "substance abuse history" in his therapy sessions but then never communicated with Father either during or after he completed the recommended sessions. In *Hector C.*, we held that the evidence was insufficient to support a finding that the causes and conditions of neglect were unlikely to change in the foreseeable future where "[n]o effort was made by CYFD to present an opinion . . . based on [the f]ather's *current* situation and on *new information* that had become available since [the father's] evaluation." 2008-NMCA-079, ¶ 19 (emphasis added). In that case, CYFD did offer expert testimony from a psychologist, who opined that the father could not resolve the causes and conditions of neglect of his child due to the combination of the father's history of drug addiction, gang affiliation, and prior incarceration. *Id.* ¶¶ 15, 19. We determined that the "evidence was stale for the purpose of determining whether those conditions persisted at the time of the hearing or would persist into the future." *Id.* ¶ 16 (quoting *State ex rel. Dep't of Human Servs. v. Natural Mother*, 1981-NMCA-103, ¶ 9, 96 N.M. 677, 634 P.2d 699). We agree with Father

14

that the district court similarly based its finding on stale evidence in this case.

**{41}** CYFD developed its treatment plan to address Father's "DWI history [and] substance abuse history[,]" but it did not present any evidence that these causes and conditions persisted or were unlikely to change in the foreseeable future. Father's DWI arrest occurred in December 2012, which was prior to the time Child was taken into custody, and more than a year had elapsed between Father's arrest and the final day of the termination trial. Given that CYFD did not reevaluate or communicate with Father after early December 2013, Steckbauer's opinion about Father's progress focused on Father's past and whether, in her general experience as a social worker, "someone" could resolve those issues in six sessions of therapy. We are not persuaded that Steckbauer's testimony alone is the type of evidence that leaves the "fact finder's mind . . . with an abiding conviction that the evidence is true." *In re Adoption of Doe*, 1982-NMCA-094, ¶ 31 (internal quotation marks and citation omitted); *see Fitzgerald v. Fitzgerald*, 1962-NMSC-028, ¶ 2, 70 N.M. 11, 369 P.2d 398 ("[T]estimony founded upon mere surmise, guess or conjecture is not substantial to support a finding of fact."). CYFD did not introduce any other evidence in support of the conclusion that Father's past conduct demonstrated that the causes and conditions of neglect persisted at the time of trial, were unlikely to change, and currently impacted Father's ability to parent Child. This lack of evidence does not constitute clear and convincing evidence.

## 2. Evidence Supporting Father's Mental Health and Domestic Violence Issues

**{42}** We now turn to the evidence pertaining to Father's mental health and domestic violence history. Father contends that the court's finding that Father was unlikely to alleviate the causes and conditions of neglect was improperly based on stale and speculative evidence related to Father's "impulsivity." In defending the court's finding on appeal, CYFD cites Steckbauer's testimony that Father's completion of six sessions of therapy was inadequate to address the "magnitude and severity" of the issues identified in Father's psychological evaluation, namely his problems with impulse control. CYFD additionally cites its "concerns" with Father's domestic violence history and that Father never completed a domestic violence assessment.

**{43}** The district court heard testimony from Steckbauer that she instructed Father in early December 2013 to address "parenting" and "his domestic violence history" in therapy. During cross-examination on the final day of trial on February 13, 2014, Father's counsel introduced a letter dated January 30, 2014 from the Mexican psychologist who had evaluated Father. The letter, which Steckbauer said she had received from the Consulate, stated that Father had successfully completed his therapy sessions, showed "favorable control of [his] emotions[,]" and was "capable of being in charge of [Child]." When asked in cross-examination whether the letter resolved her concerns about the psychologist's initial diagnosis that Father "lacks control of his impulses[,]" Steckbauer answered not "completely" because "somebody could be still struggling with impulsivity and maybe be seen to be able to make decisions, I don't know." Steckbauer said that "impulsivity" is a "big issue" that CYFD considers when assessing parental capacity and that CYFD did not "have

15

anything specifically stating that [impulsivity] was addressed."

**{44}** When asked whether Father complied with the treatment plan requirement for parenting classes, Steckbauer testified that, based on her knowledge of the documents she received from the Consulate, she believed Father addressed parenting education "to the best of his ability" because parenting classes were unavailable in Father's municipality. Nonetheless, Steckbauer testified that she did not agree with the psychologist's conclusion about Father's parenting capability because she did not believe that the psychologist's letter was a "full assessment" of the multiple aspects that factor into CYFD's determination regarding someone's ability to parent a child. Steckbauer testified that "there's more than one need, and saying that [Father] completed therapy as an equivalent of parenting classes, it's great . . . but I don't think that [Father's psychologist] from six sessions of therapy could speak to that." CYFD also elicited testimony from Steckbauer that indicated Father's psychological evaluation was deficient. Steckbauer stated that Father's therapy sessions were, in her experience, inadequate to address domestic violence, parenting education, and substance abuse areas.

**{45}** We agree with Father that the evidence was insufficient to support the district court's finding that Father had failed or was unlikely to alleviate the causes and conditions of Child's neglect in the foreseeable future. In its findings, the court specified that the psychological evaluation of Father "was not very revealing regarding his mental health" and "did not use any of the standard testing recognized in the United States." The court also stated at the conclusion of trial that the evaluation "doesn't really tell us much, except that [Father] has some impulsivity problems, which is evident in what's happened here in his past." The court further noted that Father participated in six individual therapy sessions recommended by the evaluation but that the sessions "did not satisfy [CYFD's] requirement for domestic violence . . . and parenting counseling." Again, the court relied on a lack of evidence establishing the adequacy of Father's mental health and parenting capabilities as if it were, in reality, evidence demonstrating that the causes and conditions of Child's neglect persisted at the time of trial or were likely to continue into the future.

**{46}** CYFD did not present evidence that Father was unable to safely parent Child because his present condition was plagued by unresolved mental health problems or domestic violence issues. In *State ex rel. Children, Youth & Families Dep't v. Athena H.*, this Court held that substantial evidence supported the district court's finding that the mother was unlikely to alleviate the causes and conditions of neglect due to her continued psychological instability and "the chronic abuse and trauma" that the children suffered while in the mother's care. 2006-NMCA-113, ¶ 12, 140 N.M. 390, 142 P.3d 978. In that case, the evidence in support of termination consisted of the testimony of the children's therapist and a child psychologist appointed by the court as an expert in the case. *Id*. ¶¶ 10, 12. The evidence also demonstrated that the mother had complied with the treatment plan to the best of her ability but that she had discontinued "the treatment two years prior to the termination hearing because she . . . did not believe that she needed continued care." *Id.* ¶ 10. Unlike in *Athena H.*, CYFD did not present evidence that Father suffered from the current or long-term

16

impacts of "impulsivity" that rendered him unable to properly parent Child. Even assuming the existence of this condition, CYFD did not present evidence that Father's condition persisted despite his efforts to comply with his treatment plan or that he was unwilling to pursue further treatment for the condition.

**{47}** There is also no evidence that CYFD made any effort to make proper referrals, obtain information about Father's condition, or reevaluate Father after it received his psychological evaluation or the letter regarding Father's completion of therapy. CYFD did not present any opinion, other than Steckbauer's testimony, regarding the credibility of Father's psychological evaluation, comparisons to evaluations performed in the United States, the adequacy of Father's therapy sessions, or the conclusions that could be drawn about Father from his participation in the evaluation or the sessions. Additionally, there was no evidence that any impulse control or domestic violence issues were connected to the causes and conditions that brought Child into CYFD's custody. In our review of the record, we did not identify any facts that would explain or clarify the details of Steckbauer's reference to Father's domestic violence history, and CYFD did not introduce any evidence at trial in this regard. We therefore cannot conclude that CYFD met its burden of proof and that there was substantial evidence to justify termination on those grounds. *See, e.g.*, *State ex rel. Children, Youth & Families Dep't v. Stella P.*, 1999-NMCA-100, ¶ 35, 127 N.M. 699, 986 P.2d 495 (stating that in a case of a parent whose mental illness constituted the basis for CYFD's proposed termination, CYFD must present "sufficient testimony to allow the court to make the statutorily required findings" under the ANA).

### 3.      Evidence Supporting Father's Ability to Provide Safe and Stable Housing

**{48}** Finally, we address the evidence pertaining to the home study requested by CYFD and conducted by the Consulate as part of Father's treatment plan. Given that Father pleaded no contest to CYFD's neglect allegations that he had "failed to provide for [Child's] basic necessities[,]" Father's ability to obtain safe and stable housing was obviously fundamental to Father's progress toward alleviating the causes and conditions of neglect. *See In re Grace H.*, 2014-NMSC-034, ¶ 11 (stating that the treatment plan required by the ANA sets forth services "the parents must complete in order to address the causes and conditions which led to removal of the child from the home"). Accordingly, Father's treatment plan required that he "obtain and maintain safe and stable housing[,]" and CYFD was required to "monitor [Father's] current living arrangement." Steckbauer also testified that she instructed Father to have a home study completed as part of the treatment plan.

**{49}** The home study was conducted on November 5, 2013 and sent by email to Steckbauer by Consulate staff. The study indicated that Father had obtained employment and lived in a home with his mother and sister. Father also provided his financial information as part of the study. Steckbauer testified that, based on the study, the home looked appropriate and that she did not have any problem with its physical structure or cleanliness. Despite the favorable results, CYFD's counsel elicited testimony from Steckbauer that was critical of the study. Steckbauer testified that the study did nothing to explore Father's possible

17

criminal history or any possible abuse or neglect allegations against Father in Mexico. She also said that she had no knowledge of the length of time it took Mexican investigators to complete the home study, whether investigators had interviewed members of Father's family outside of the home, or whether investigators had explored "medical issues" of anyone in Father's family. The district court found that the "home was deemed appropriate, however, the home study did not include a criminal history for the family members, or any documentation as to a lack of abuse and neglect allegations. It was unclear whether anyone other than the family members were interviewed, or whether any medical issues were considered." The court stated at the conclusion of trial that Father's mother and sister, who lived in the home, were "probably good people, but we don't know."

{50}    Once more, based on the lack of evidence before it, the district court improperly shifted CYFD's statutory burden of proof required in a termination case to Father. The court's finding pointed to the lack of information included in the study as evidence in favor of termination; however, it was CYFD's statutory responsibility to support its termination motion by presenting evidence that established that Father's home was unsafe or unstable, which CYFD failed to do. To the contrary, based on the evidence presented at trial, the district court found that the home "was deemed appropriate[.]" Even more telling, CYFD did not present evidence that suggested that the study was incomplete or deficient as a result of Father's unwillingness to participate in the study or disclose information. Steckbauer informed Father in December 2013 that she had received the home study, but she never discussed the results of the study with Father nor notified him of any additional information CYFD required. There is also no evidence that CYFD communicated with the Consulate to express its reservations about the completeness of the study or to request any information whatsoever. We therefore are not convinced that the evidence of the home study constitutes substantial evidence supporting the district court's finding.

{51}    Notably, in announcing its findings at the conclusion of trial, the court explained that it believed that Father had made efforts to alleviate the causes and conditions of Child's neglect, "credit[ed] him with making efforts," and stated that it "underst[ood] it's difficult in Mexico." While we recognize that "[e]ven with a parent's reasonable efforts, . . . the parent may not be able to make the changes necessary to rectify the causes and conditions of the neglect and abuse so as to enable the court to conclude that the parent is able to properly care for the child[,]" *Athena H.*, 2006-NMCA-113, ¶ 9, we cannot conclude that there was clear and convincing evidence to support the district court's determination that Father was unable to alleviate the causes and conditions of Child's neglect in the foreseeable future. We reiterate that Father's deportation did not absolve CYFD from its required statutory burden of proof in termination proceedings. *See State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 22, 136 N.M. 53, 94 P.3d 796 ("Because a [termination of parental rights] hearing irrevocably divests parents of all legal rights in their children . . . CYFD carries the burden of proof by clear and convincing evidence.").

{52}    In holding that CYFD failed to meet its burden, we do not overlook the evidence pertaining to Father's efforts to provide support for and communicate with Child. This

evidence may indicate abandonment of Child; however, abandonment under Section 32A-4-28(B)(1) was not a proper basis for termination in this case. *See Christopher B.*, 2014-NMCA-016, ¶ 12 ("Multiple factors may indicate abandonment, including an absence of financial support and a purposeful declination of opportunities to remain in contact with the child or children."); *see also In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 22, 132 N.M. 772, 55 P.3d 984 ("A parent's contact with the children and financial support for the children during their absence will weigh against a finding of abandonment."). We have difficulty concluding that this same evidence supports termination on the basis that Father was unlikely to alleviate the causes and conditions of Child's neglect in the foreseeable future. Father's ability to provide financial support to Child was hampered by his incarceration for the initial seven months of the case, but the home study indicated that Father obtained employment shortly after his deportation. Steckbauer testified that an important part of Father's "financial plan" requirement under his treatment plan was that he maintain employment. Given the very young age of Child, we are also not persuaded that Father's failure to send letters, which Child could not read or comprehend, is dispositive of Father's inability to maintain a bond with Child. Child was four months old at the time CYFD took him into custody and was just over a year old at the time of Father's termination trial. We do not believe this evidence alone is substantial evidence to support termination under Section 32A-4-28(B)(2).

## C.    Reasonable Efforts by CYFD

**{53}**    Father next argues that clear and convincing evidence did not support the district court's determination that CYFD made reasonable efforts to assist Father in adjusting the causes and conditions that led to CYFD's custody of Child. Father contends CYFD failed to comply with its statutory obligation to pursue reunification by not engaging in sufficient efforts to communicate with Father or the Mexican Consulate following his deportation, and he advances several arguments in support of this claim, including that CYFD (1) failed to request information that it deemed necessary to complete the home study and Father's psychological evaluation; and (2) failed to determine if Father's relatives in Mexico would be a suitable placement for Child.

**{54}**    CYFD is required to "provide reasonable efforts to assist the parent to change the conditions that gave rise to the neglect and abuse, and the district court must consider the results of CYFD's efforts." *Athena H.*, 2006-NMCA-113, ¶ 9. "What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Patricia H.*, 2002-NMCA-061, ¶ 23. In determining whether CYFD's efforts were reasonable, we also consider the duration of reunification services provided to a parent by CYFD prior to resorting to termination. *Id*. ¶ 26. This Court has used the time period for reunification services set forth under federal law as a touchstone in our reasonable efforts analysis. *Id*. The Adoption and Safe Families Act (ASFA), Pub. L. No. 105-89, 111 Stat. 2115 (1997), provides that a fifteen-month period following the placement of a child into foster care consists of "time-limited reunification services." *Id*.; *see also Hector C.*,

19

2008-NMCA-079, ¶ 26 (applying ASFA's fifteen-month window as the time period for analyzing whether CYFD's efforts were reasonable under the ANA).

**{55}** We cannot conclude that substantial evidence supported the district court's determination that CYFD made reasonable efforts when the evidence shows that CYFD's approach to the circumstances of Father's deportation foreclosed any possibility of achieving the goal of reunification. Although Father's treatment options during his incarceration in the United States were limited, Father engaged in an addiction treatment program, provided CYFD the names of relatives living in the United States so that placement options could be explored, and wrote to Child in April 2013. Steckbauer testified that she did use the assistance of an interpreter to meet with Father monthly during that time, and she also explored Father's relatives in the United States as possible placement options for Child. Yet CYFD's reunification efforts abruptly changed following Father's deportation and participation in treatment services in Mexico.

**{56}** CYFD requested the Consulate's assistance in conducting a psychological evaluation and a home study after Father was deported in September 2013.[1] Nevertheless, at the end of October 2013, CYFD moved to terminate Father's parental rights. In its motion, CYFD asserted that Father had failed to comply with all aspects of his treatment plan, including that Father failed to (1) maintain weekly contact with CYFD, (2) discuss his history with CYFD, (3) complete a mental health assessment, (4) submit proof that he had obtained safe and stable housing, and (5) participate in family time with Child. We are troubled that CYFD requested the Consulate's assistance in offering treatment plan services to Father following his deportation, then approximately one month later sought to terminate Father's rights on grounds that he failed to comply with that plan. It is also disconcerting that the evidence presented at trial plainly conflicted with certain key representations about Father's conduct alleged by CYFD in its termination motion. As we previously stated, Steckbauer based her

---

[1]Father argues on appeal with regard to CYFD's reasonable efforts that CYFD violated Article 37 of the Vienna Convention on Consular Relations (VCCR), April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261, by failing to provide the Mexican Consulate timely notification of CYFD's custody of Child. The VCCR is a multilateral international treaty that regulates various consular activities between countries that are parties to the treaty. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337-38 (2006). Father raises the issue of consular notification for the first time on appeal and thus did not properly preserve this argument in the district court proceedings below. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"). In any event, our Supreme Court has determined that "the provisions of the VCCR do not create legally enforceable individual rights." *State v. Martinez-Rodriguez*, 2001-NMSC-029, ¶ 15, 131 N.M. 47, 33 P.3d 267, *abrogated on other grounds as recognized by State v. Forbes*, 2005-NMSC-027, ¶ 6, 138 N.M. 264, 119 P.3d 144. Therefore, Father does not have standing to enforce Article 37 of the VCCR. *See Martinez-Rodriguez*, 2001-NMSC-029, ¶ 15.

development of the treatment plan on Father's disclosures about his history. Steckbauer also testified that Father called her after he was deported in September 2013, that she spoke to him by telephone in October 2013, and that during that conversation she told him to maintain *monthly* contact with CYFD. Furthermore, Steckbauer testified that Father was unable to have in-person visitation with Child, demonstrating that CYFD was well aware that Father's participation in family time with Child was complicated by the circumstances of his incarceration and deportation.

**{57}** Despite CYFD's termination motion, Father demonstrated efforts to cooperate in treatment services intended to assist him in adjusting the conditions that rendered him unable to properly care for Child. By early December 2013, Father participated in the home study and psychological evaluation requested by CYFD. He also submitted a urinalysis and was slated to begin therapy sessions that were recommended by the psychological evaluation. During his telephone conversation with Steckbauer that month, Father inquired about Child's well-being and asked Steckbauer to send him a picture of Child; however, Steckbauer ceased her communication with Father after that telephone call, citing "caseload" issues as the reason she did not arrange a call with Father. Steckbauer did not inform Father of additional information necessary to complete the home study or direct him to submit additional urinalyses. Further, we find it noteworthy that Steckbauer testified that she never spoke to Father about what he earned from his job, whether he was saving his money, or why he was not sending money to Child, despite his employment. She also did not contact him after she received his psychological evaluation and, as a result, never recommended to Father that he address any impulsivity problems in his therapy sessions. Steckbauer testified that "impulsivity" was a significant issue in assessing parental capacity but that Father was never notified that his "impulsivity" problems could constitute a basis for termination. *See State ex rel. Children, Youth & Families Dep't v. Joseph M.*, 2006-NMCA-029, ¶¶ 20, 22, 139 N.M. 137, 130 P.3d 198 (holding that there was insufficient evidence to support that CYFD made reasonable efforts to assist the father because CYFD never informed him that his relationship with the mother was a cause and condition of the abuse and neglect that could be a basis for termination). CYFD also made no attempt to reevaluate Father after he completed the recommended therapy sessions in order to assess his progress. In essence, CYFD halted its reunification efforts less than one year after taking custody of Child, then required Father to present evidence at trial that rebutted CYFD's presumption that he was unfit to parent Child.

**{58}** We also agree with Father that CYFD fell short in its efforts, required under the ANA, to explore whether Father's relatives in Mexico would serve as suitable placement options for Child. Section 32A-4-25.1(D) provides that "[i]f the court adopts a permanency plan other than reunification, the court shall determine whether [CYFD] has made reasonable efforts to identify and locate all grandparents and other relatives." In *State ex rel. Children, Youth & Families Department v. Laura J.*, this Court "emphasize[d] that Section 32A-4-25.1(D) imposes a duty upon the district court to make a serious inquiry into whether [CYFD] has complied with its mandate to locate, identify, and consider relatives with whom to place children in its custody." 2013-NMCA-057, ¶ 61, 301 P.3d 860. We further stated:

> In future cases, such inquiry will not be satisfied by a pro forma ratification of [CYFD's] assertions that such efforts have been made. . . . [I]n order to comply with the relatives search requirement of Section 32A-4-25.1(D), the court must conclude that [CYFD], through all of its available resources, has met its affirmative duty to "identify and locate . . . [and] conduct home studies on any appropriate relative expressing an interest in providing permanency for the child." Section 32A-4-25.1(D).

*Laura J.*, 2013-NMCA-057, ¶ 61 (fifth and sixth alterations in original). The district court did not indicate such a conclusion in its findings of facts and conclusions of law, and we have difficulty concluding that Steckbauer's testimony consitutes evidence that her efforts to consider Father's Mexican relatives as potential placements for Child were reasonable. Steckbauer testified that Father's relatives in the United States suggested to her that their family members in Mexico could have been potential placement options for Child. She also testified that she spoke with the Consulate about the possibility of Father's family in Mexico being a foster care placement for Child, but she could not remember the time that discussion occurred or its outcome, and she never spoke to his mother and sister. When Father's counsel asked Steckbauer if she knew if Father's mother and sister were interested in being foster care placements, she responded that she said "it would be explored, but [Father's mother and sister] haven't communicated through the Consulate or me any further to pursue that." However, because of her conversations with the Consulate, Steckbauer testified that she knew that mother and sister were willing to have Child in the home. We cannot conclude that this evidence is sufficient to survive the type of inquiry that we imposed in *Laura J.* to ensure that CYFD met its obligations under Section 32A-4-25.1(D).

**{59}**     In response to Father's arguments on appeal, CYFD points to its efforts to request the psychological evaluation and home study, obtain documentation of their completion, and translate the results. CYFD also argues that it sought the Consulate's assistance in using the Consulate's mail system to facilitate Father's communication with Child and that CYFD explored Father's relatives in the United States as possible placement options. Considering the totality of the circumstances, we do not agree with CYFD that these efforts met the minimum statutory requirements under the ANA. *See Patricia H.*, 2002-NMCA-061, ¶ 28 ("[An appellate court's] job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law."). Father made efforts to comply with the services offered in Mexico as part of his treatment plan once he was free from the restrictions of his incarceration. In light of Father's efforts, we cannot attribute the resulting lack of evidence related to the causes and conditions of neglect to Father. *Cf. Hector C.*, 2008-NMCA-079, ¶ 20 (holding that CYFD failed to present clear and convincing evidence that the causes and conditions of neglect were unlikely to change in the foreseeable future when the father complied with his treatment plan and CYFD failed to reevaluate the father following his release from prison). Additionally, Child had been in CYFD's custody for nine months at the time CYFD moved for termination, and CYFD ended its contact with Father less than twelve months after CYFD took custody of Child. This time period expired well before the

fifteen-month period of time-limited reunification services established by ASFA. We acknowledge "CYFD's duty to expeditiously handle [termination] cases," *id.*, but its actions suggest that it did not properly assist Father in ameliorating the causes and conditions of Child's neglect. *See Natural Mother*, 1981-NMCA-103, ¶ 14 (holding that the Human Services Department failed to make reasonable efforts and "acted in bad faith" when it disregarded the mother's efforts and rejected a favorable home study). We therefore conclude that substantial evidence of a clear and convincing nature did not exist to support the district court's finding that CYFD made reasonable efforts to assist Father in adjusting the causes and conditions that led to CYFD's custody of Child.

### D.    Best Interests of Child

**{60}**    The ANA requires the district court to "give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." Section 32A-4-28(A). It is well established, however, that adherence to this statutory principle "cannot be done to the utter exclusion of consideration of the rights of a parent to raise [his or] her children." *Natural Mother*, 1981-NMCA-103, ¶ 16. "[I]n termination of parental rights proceedings, there is often a tension between the [child's needs] and the understanding that parental rights are among the most basic rights of our society and go to the very heart of our social structure." *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2007-NMCA-070, ¶ 34, 141 N.M. 692, 160 P.3d 601 (internal quotation marks and citation omitted).

**{61}**    Based on our review of the trial record, the district court found Father's acknowledgment of the language barrier between Father and Child highly persuasive in determining Child's need for permanency. The court explicitly stated in its written findings that "[Father] acknowledged that he has not seen [Child] since December of 2012, and that [Child] would not recognize him. He also acknowledged that [Child] does not speak Spanish, that language would be a barrier, and that [Child] would have to get to know [Father] 'little by little.'" In announcing its termination decision at the end of trial, the court explained that Father's testimony regarding the language barrier was "very telling, because his son wouldn't be able to communicate with him as a result of this break in their communication, literally."

**{62}**    We are unconvinced that, as a general rule, native language disparities between a natural parent and his or her infant child are insurmountable obstacles to reunification. We have serious reservations about the district court's reliance on this theory in light of the lack of evidence before the court in this case. There was no evidence presented by CYFD that Child, who was approximately eighteen months old at the time of trial and in the early stages of developing his language capabilities, possessed an inability to learn Spanish that fatally inhibited his reunification with Father. Steckbauer testified that it would be "harmful" to return Child to Father because there had been no "direct communication" between Father and Child. However, CYFD failed to present any evidence that Father's native language rendered him incapable of caring for Child. Moreover, the lack of evidence related to the

23

home study impaired the court's knowledge of the adequacy of the home environment that would await Child in Mexico. The court did hear evidence that Child had resided in a stable foster home environment in the United States with his half-brother since CYFD took custody of Child, but "a parent's rights may not be terminated simply because a child might be better off in a different environment." *Joseph M.*, 2006-NMCA-029, ¶ 16 (internal quotation marks and citation omitted). We therefore cannot agree that presumptions about Child's Spanish-speaking skills, given the young age of Child and the truncated time period of CYFD's reunification efforts, indicated an irreparable disintegration of the parent-child relationship that overwhelms all other considerations in this case.

**{63}** We do not suggest that Child's best interest is to be reunited with Father in Mexico. We recognize that Child now resides in a foster home with his half-brother and Child's permanency needs are significant. However, CYFD's failure to comply with its statutory mandate to make reasonable efforts and carry its evidentiary burden of proof in this case improperly deprived Father of his rights. This Court has specified that a judgment terminating parental rights must be entered "only with the utmost circumspection and caution" due to the fundamental nature of those rights. *Stella P.*, 1999-NMCA-100, ¶ 33; *see In re Termination of Parental Rights of Reuben & Elizabeth O.*, 1986-NMCA-031, ¶ 36, 104 N.M. 644, 725 P.2d 844 ("Termination of parental rights is not a matter to be lightly taken."). Upon remand of this case, "[i]t is clear that the district court is in the best position to determine the present circumstances of [Child] and Father and to balance the emotional interests of [Child] and Father's rights." *Lance K.*, 2009-NMCA-054, ¶ 41.

## CONCLUSION

**{64}** New Mexico law does not relieve CYFD of its statutory mandate to make reasonable efforts to assist the parent in adjusting the causes and conditions of neglect simply because the parent has been deported to another country. The ANA affirmatively places the burden on CYFD, not the parent, to prove by clear and convincing evidence that the parent is unlikely to alleviate the causes and conditions of neglect in the foreseeable future. In this case, CYFD moved to terminate Father's parental rights one month after his deportation and discontinued its communication with Father shortly thereafter. Additionally, CYFD failed to reevaluate Father's progress in ameliorating the causes and conditions of neglect, despite Father's efforts to comply with significant aspects of his treatment plan. Accordingly, we conclude that CYFD's subsequent presentation of incomplete evidence was not substantial evidence of a clear and convincing nature that justified termination of Father's parental rights under the ANA. The district court's termination for abandonment was likewise improper. We therefore reverse the district court's termination of Father's parental rights under Section 32A-4-28(B)(1) and Section 32A-4-28(B)(2), and we remand this case for further proceedings consistent with this opinion.

**{65}    IT IS SO ORDERED.**

---

24

                                        **JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**LINDA M. VANZI, Judge**

25